**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

WILLIAM A. KEITEL ,            )
                                  )    Civil Action No. 11-1209
            Petitioner,     )
                                  )
v.                             )    Magistrate Judge Cynthia Reed Eddy
                                  )
JOSEPH MAZURKIEWICZ,      )
                                  )
           Respondent.    )
                                  )

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

**I.**     **RECOMMENDATION**

It is respectfully recommended that the Petition for Writ of Habeas Corpus be denied and there is no basis upon which to issue a certificate of appealability.

**II.**     **REPORT**

Petitioner, William A. Keitel, a state prisoner serving a life sentence at the State Correctional Institution at Houtzdale, Pennsylvania has petitioned for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in connection with his convictions for the killing of his estranged wife, Michelle Keitel and her fiancé, Charles Dunkle. For the reasons that follow, the Petition should be denied.

### A. Relevant Factual and Procedural History

On direct appeal, the Superior Court of Pennsylvania, sitting *en banc*, set forth the following relevant facts.

> The case *sub judice* arose from a contentions divorce and custody dispute between Appellant and his estranged wife, Michelle Walker Keitel. In March 1997, Appellant was awarded joint custody of the couple's children, to be shared with Michelle Keitel. Because of the acrimonious nature of the fractured marriage, custody exchanges initially took place at local police stations. Eventually, however, the exchange point was moved to the parking lots of

neighborhood convenience stores.

On January 1, 1998, Michelle Keitel was scheduled to transfer the children into Appellant's care at a local Stop 'N Go convenience store at 10:00 a.m. At approximately 8:30 p.m., Appellant approached Officer Keith Carney to request his assistance in obtaining the court ordered transfer of custody from Michelle. Officer Carney checked the file at the police office, and, after determining that in fact Michelle was in violation of the custody order, placed a telephone call to Michelle. Michelle's answering machine picked up Officer Carney's call, whereupon he left a message requesting Michelle to call him back. Within minutes, Michelle returned the phone call, asserting that she had misread the court order.

Despite a court order limiting attendance at the custody exchange to only family members of the natural parents, Michelle Keitel brought her paramour, Charles Dunkle, as well as her father, Charles Walker, and her uncle, Terry Miller, to the exchange. Appellant arrived at the custody exchange with his father, William Keitel, Sr. After the children were transferred into Appellant's vehicle, a dispute arose. The exact circumstances of what happened next were hotly contested at trial. However, the end result is not disputed: Appellant shot Michelle Keitel, Charles Dunkle, and Charles Walker, killing Keitel and Dunkle.

Officer Carney was the first officer to arrive on the scene and, after conducting a preliminary investigation, he took Appellant into custody. Appellant was then transported to the Allegheny County homicide offices, where he was interviewed by Regis Kelly. After receiving <u>Miranda</u> warnings, Appellant agreed to speak with Detective Kelly. Following an investigation, Appellant was charged with 2 counts of criminal homicide, 1 count of aggravated assault, and 5 counts of recklessly endangering another person.

Appellant filed a pretrial motion seeking to suppress statements he made after he invoked his right to an attorney during questioning. The trial court granted Appellant's motion. Trial commenced on October 22, 1998, concluding in a jury verdict finding Appellant guilty of 1 count of first degree murder for the killing of Michelle Keitel, 1 count of third degree murder for the killing of Charles Dunkle, 1 count of aggravated assault for the shooting of Charles Walker, and 5 counts of recklessly endangering another person. After the jury deadlocked on the issue of imposition of the death penalty, the trial court sentenced Appellant on the first degree murder conviction to life imprisonment without the possibility of parole. Sentencing on the remaining convictions was deferred until January 14, 1999.

Keitel then engaged in filing a series of post-sentence motions, which somewhat explains the lengthy period of time it took to reach our Court on direct appeal. On November 6, 1998, Keitel flied his first set of post-sentence motions. Thereafter, on January 14, 1999, without ruling on the post-sentence motions, the

trial court sentenced Keitel to an additional thirty-five to seventy years imprisonment on the remaining convictions, to be served consecutive to the sentence on the first degree murder conviction. Thereafter, on January 20, 1999, Keitel filed additional post-sentence motions. Finally, Keitel filed supplemental post-sentence motions on January 5, 2001. All of the post-sentence motions were then denied by the trial court.

Keitel failed to timely appeal his judgment of sentence, but his direct appeal rights were reinstated *nunc pro tunc* on October 10, 2001.

ECF No. 7-7, pp. 1-4.

Petitioner filed a timely appeal and on November 27, 2006, the Superior Court of Pennsylvania affirmed Petitioner's judgment of sentence. Petitioner filed a Petition for Allowance of Appeal to the Supreme Court of Pennsylvania, which was denied by that Court on June 5, 2007.

On May 8, 2008, Petitioner, through counsel, filed a Petition for relief under the Pennsylvania Post Conviction Relief Act (P.C.R.A), 42 Pa. Cons. Stat. § 9541-46. Following appointment of new counsel, an Amended Petition was filed. On January 7, 2010, Judge Manning issued a Notice of Intent to Dismiss. On March 1, 2010, Judge Manning issued an Order of Court dismissing the Amended PCRA Petition. Petitioner filed a timely notice of appeal and on December 27, 2010, the Superior Court of Pennsylvania affirmed the denial of PCRA relief (ECF No. 10-5). Petitioner filed a Petition for Allowance of Appeal, which was denied by the Supreme Court of Pennsylvania on July 19, 2011.

Petitioner filed his timely Petition for a Writ of Habeas Corpus with this Court on September 18, 2011 wherein he raises the following claims.

1. Whether the trial court erred in denying a motion for mistrial when the Commonwealth presented testimony that Defendant invoked his right to remain silent and Defendant failed to tell police certain facts after he invoked his right to counsel.

2. The Defendant did not receive a fair trial under the federal constitution

where the Commonwealth was permitted by the trial court over trial counsel's objection to ask the Defendant if he had ever told his wife that he gave someone $10,000 to have his first wife killed.

3.      Trial counsel was ineffective under the 6th Amendment for failing to object to the court's erroneous jury instruction which created an unconstitutional mandatory presumption in favor of the Commonwealth and directed a verdict of guilty of murder of Charles Dunkle in violation of Defendant's federal right to due process.

4.      Trial counsel was ineffective for failing to object to the trial court's instructions regarding justification:  (a) where the court failed to instruct the jury that a killing may be justified if, in the course of defending himself, the defendant accidently kills another; and (b) the court failed to instruct the jury regarding mistaken belief of imminent danger.

## B. Standards Governing Federal habeas Corpus Review

1.      Exhaustion Requirement

The provisions of the federal habeas corpus statute at 28 U.S.C. § 2254(b) require a state prisoner to exhaust available state court remedies before seeking federal habeas corpus relief.  To comply with the exhaustion requirement, a state prisoner first must have "fairly presented" his constitutional and federal law issues to the state courts through direct appeal, collateral review, state *habeas* proceedings, *mandamus* proceedings, or other available procedures for judicial review. *See, e.g.*, Castille v. Peoples, 489 U.S. 346, 351 (1989); Doctor v. Walters, 96 F.3d 675, 678 (3d Cir. 1996); Burkett v. Love, 89 F.3d 135, 137 (3d Cir. 1996).  To "fairly present" a claim, a petitioner must present a federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted.  McCandless v. Vaughn, 172 F.3d 255, 261 (3d Cir. 1999).  A petitioner can "fairly present" his claim through: (a) reliance on pertinent federal cases; (b) reliance on state cases employing constitutional analysis in like fact situations; (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution; and (d) allegation of a pattern of facts that is well within the

mainstream of constitutional litigation. *Id*. At 260. Even if a state court refuses to consider the claim on procedural grounds, it is still exhausted as long as the state court had the opportunity to address it. Bond v. Fulcomer, 864 F.2d 306, 309 (3d Cir.1989);

   In addition, in order to exhaust his claims, a habeas corpus petitioner must "properly present" his claims to the state courts. In this regard, a petitioner must invoke "one complete round" of the applicable State's appellate review process, thereby giving the courts of that State "one full opportunity" to resolve any issues relevant to such claims. O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999) (holding that a petitioner must present every claim raised in the federal petition to the state's trial court, intermediate appellate court and highest court before exhaustion would be considered satisfied). The petitioner has the burden of establishing that exhaustion has been satisfied. Ross v. Petsock, 868 F.2d 639, 643 (3d Cir. 1989); O'Halloran v. Ryan, 835 F.2d 506, 508 (3d Cir. 1987).[1]

   A petitioner shall not be deemed to have exhausted state remedies, however, if he has the right to raise his claims by any available state procedure. 28 U.S.C. § 2254(c). Exhaustion is not a jurisdictional limitation, however, and federal courts may review the merits of a state petitioner's claims prior to exhaustion when no appropriate state remedy exists. Christy v. Horn, 115 F.3d 201, 206 (3d Cir. 1997); Doctor, 96 F.3d at 681; Carter v. Vaughn, 62 F.3d 591, 594 (3d Cir. 1995). Moreover, a federal court may deny a petitioner's claims on the merits notwithstanding a petitioner's failure to comply with the exhaustion requirement. 28 U.S.C. § 2254(b)(2).

---

[1]. On May 9, 2000, the Pennsylvania Supreme Court issued In re: Exhaustion of State Remedies in Criminal and Post Conviction Relief Cases, No. 218 Judicial Administration Docket No. 1 (Order 218), which provides that direct criminal appellants and PCRA petitioners need not file petitions for allowance of appeal in order to exhaust all "available" state remedies for habeas corpus purposes. Order 218 applies only prospectively and it has no application to cases involving petitioners whose time for seeking discretionary review had already expired prior to May 9, 2000. Wenger v. Frank, 266 F.3d 218, 226 (3d Cir. 2001).

2.      Procedural Default Doctrine

The mere fact that a petitioner is unable to exhaust his claims on the basis that state procedures are unavailable does not necessarily mean that a federal court can reach the merits of his or her claims. Claims that cannot be exhausted because of a state procedural bar are procedurally defaulted, precluding a federal court from proceeding to address them further. In Cone v. Bell, 556 U.S. 449 (2009), the United States Supreme Court explained:

> It is well established that federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that is independent of the federal question and adequate to support the judgment. In the context of federal habeas proceedings, the independent and adequate state ground doctrine is designed to ensure that the States' interest in correcting their own mistakes is respected in all federal habeas cases. When a petitioner fails to properly raise his federal claims in state court, he deprives the State of an opportunity to address those claims in the first instance and frustrates the State's ability to honor his constitutional rights. Therefore, consistent with the longstanding requirement that habeas petitioners must exhaust available state remedies before seeking relief in federal court, we have held that when a petitioner fails to raise his federal claims in compliance with relevant state procedural rules, the state court's refusal to adjudicate the claim ordinarily qualifies as an independent and adequate state ground for denying federal review.

556 U.S. at 465 (internal quotations and citations omitted).

Federal habeas corpus review is not barred every time that a state court invokes a procedural rule to preclude its review of the federal claims asserted by a state prisoner. A state procedural rule can preclude federal habeas corpus review only if it is "firmly established" and "consistently and regularly applied" by the State's courts. Kindler v. Horn, 542 F.3d 70, 78 (3d Cir. 2009). Specifically, the state rule must speak in unmistakable terms, and the state courts' refusal to review a petitioner's claim must be consistent with decisions in similar cases. Id. at 79. An "occasional act of grace by a state court in excusing or disregarding a state procedural rule does not render the rule inadequate." Banks v. Horn, 126 F.3d 206, 211 (3d Cir. 1997) (quoting Amos v. Scott, 61 F.3d 333, 342 (5th Cir. 1995)). A state rule is adequate to preclude

federal habeas corpus review if it is applied by state courts in "the vast majority of cases." Dugger v. Adams, 489 U.S. 401, 410, n. 6 (1989).

Moreover, violations of a state's procedural rules may constitute an independent and adequate state ground sufficient to invoke the procedural default doctrine even where no state court explicitly has concluded that a petitioner is procedurally barred from raising his claims. Glass v. Vaughn, 65 F.3d 13, 15 (3d Cir. 1995), *cert. denied*, 516 U.S. 1151 (1996). A petitioner whose constitutional claims have not been addressed on the merits due to procedural default can overcome the default, thereby allowing federal court review, if he or she can demonstrate either: 1) "cause" for the default *and* "actual prejudice" as a result of the alleged violation of federal law; or 2) failure to consider the claims will result in a "fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 750 (1991).

3.     Standard of Review for Exhausted (but not Procedurally Defaulted) Claims

In describing the role of federal habeas corpus proceedings, the Supreme Court of the United States, in Barefoot v. Estelle, 463 U.S. 880, 887 (1983), noted:

> [I]t must be remembered that direct appeal is the primary avenue for review of a conviction or sentence.... The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited. Federal courts are not forums in which to relitigate state trials.

In 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104-132, 110 Stat. 1214, April 24, 1996, (AEDPA), which further "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002).

Amended Section 2254 of the federal habeas corpus statute provides the standard of review for federal court review of state court criminal determinations and provides, in relevant part, as follows:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> > (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.

28 U.S.C.§ 2254(d).

"Clearly established Federal law" should be determined as of the date of the relevant state-court decision and is limited to the record that was before the state court that adjudicated the claim on the merits.  Greene v. Fisher, ___ U.S. ___, 132 S.Ct. 38 (2011); Cullen v. Pinholster, 563 U.S. ——, 131 S.Ct. 1388, 1398 (2011).  A state-court decision is "contrary to" clearly established federal law if the state court (1) contradicts the governing law set forth in Supreme Court cases or (2) confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result.  Williams v. Taylor, 529 U.S. 362, 405-06 (2000); Jamison v. Klem, 544 F.3d 266, 274 (3d Cir. 2008).  The state court judgment must contradict clearly established decisions of the Supreme Court, not merely law articulated by any federal court, Williams, 529 U.S. at 405, although district and appellate federal court decisions evaluating Supreme Court precedent may amplify such precedent, Hardcastle v. Horn, 368 F.3d 246, 256 n. 3 (3d Cir. 2004) (citing Matteo v. Superintendent, SCI Albion, 171 F.3d 877, 890 (3d Cir. 1999)).  The state court is not required to cite or even have an

awareness of governing Supreme Court precedent "so long as neither the reasoning nor the result of [its] decision contradicts them."  Early v. Packer, 537 U.S. 3, 8, (2002); Jamison, 544 F.3d at 274-75.  Few state court decisions will be "contrary to" Supreme Court precedent.

The federal habeas court more often must determine whether the state court adjudication was an "unreasonable application" of Supreme Court precedent.  A state-court decision 'involves an unreasonable application" of clearly established federal law if the state court (1) identifies the correct governing legal rule from the Supreme Court's cases but unreasonably applies it to the facts of the particular case; or (2) unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.  Williams, 529 U.S. at 407.  A showing of clear error is not sufficient.  Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003).  Nor is habeas relief available merely because the state court applied federal law erroneously or incorrectly.  Thomas v. Varner, 428 F.3d 491, 497 (3d Cir. 2005); Jacobs v. Horn, 395 F.3d 92, 100 (3d Cir. 2005).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  Harrington v. Richter, 562 U.S. ——, ——,131 S.Ct. 770, 786 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).  Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement."  Harrington, 131 S. Ct. at 786–87.

A recent decision of the Supreme Court illustrates the deference that the federal courts must accord to state court decisions.  In Renico v. Lett, ___ U.S. ___, 130 S.Ct. 1855 (2010), the

Supreme Court reviewed the Court of Appeals for the Sixth Circuit's grant of a writ of habeas corpus to a defendant who was retried for murder following the trial judge's grant of a mistrial after the jury had deliberated for at least four hours following a relatively short, and far from complex, trial. The Michigan Supreme Court had concluded there was no violation of the Double Jeopardy Clause because the trial court exercised its sound discretion. The federal district court granted a writ of habeas corpus and the Sixth Circuit affirmed, both concluding that the trial court's declaration of a mistrial constituted an abuse of discretion because there was no manifest necessity. The Supreme Court reversed.

> It is important at the outset to define the question before us. That question is not whether the trial judge should have declared a mistrial. It is not even whether it was an abuse of discretion for her to have done so-the applicable standard on direct review. The question under AEDPA is instead whether the determination of the Michigan Supreme Court that there was no abuse of discretion was "an unreasonable application of ... clearly established Federal law." § 2254(d)(1).

Lett, 130 S.Ct. at 1862. The Supreme Court further instructed:

> It is not necessary for us to decide whether the Michigan Supreme Court's decision - or, for that matter, the trial judge's declaration of a mistrial - was right or wrong. The latter question, in particular, is a close one. As Lett points out, at a hearing before the Michigan Court of Appeals, the state prosecutor expressed the view that the judge had in fact erred in dismissing the jury and declaring a mistrial. The Michigan Supreme Court declined to accept this confession of error, People v. Lett, 463 Mich. 939, 620 N.W.2d 855 (2000), and in any event - for the reasons we have explained - **whether the trial judge was right or wrong is not the pertinent question under AEDPA.**

Id. at 1865, n. 3 (emphasis added).[2] See also Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'").

---

2. See also Harris v. Ricci, 607 F.3d 92, 99 (3d Cir. 2010) (explaining and applying Lett).

Moreover, a federal court must accord a presumption of correctness to a state court's factual findings, which a petitioner can rebut only by clear and convincing evidence. 28 U.S.C. § 2254(e). Where a state court's factual findings are not made explicit, a federal court's "duty is to begin with the [state] court's legal conclusion and reason backward to the factual premises that, as a matter of reason and logic, must have undergirded it." Campbell v. Vaughn, 209 F.3d 280, 289 (3d Cir. 2000). In determining what implicit factual findings a state court made in reaching a conclusion, a federal court must infer that the state court applied federal law correctly. Id. (citing Marshall v. Lonberger, 459 U.S. 422, 433 (1982)).

### C. Review of Petitioner's Claims

1. Improper Questioning About Defendant's Post-Arrest Silence

First, Petitioner claims that the trial court violated his right to due process by questioning him on his post-arrest silence. This claim invokes the protection of the Fifth Amendment, which provides that no person shall be compelled in any criminal case to be a witness against himself. U.S. Const. amend. V. Warnings provided by law enforcement officials pursuant to Miranda v. Arizona, 384 U.S. 436 (1966), provide "a prophylactic means of safeguarding Fifth Amendment rights."

Once a criminal defendant receives the prophylactic warnings required by Miranda, it is improper for a prosecutor to cause the jury to draw an impermissible inference of guilt from a defendant's post-arrest silence. Doyle v. Ohio, 426 U.S. 610, 617 (1976) (concluding that the use of a defendant's post-Miranda silence to impeach that defendant's exculpatory testimony violated the Due Process Clause of the Fourteenth Amendment). This is so because Miranda warnings carry the Government's implicit assurance that an arrestee's invocation of the Fifth Amendment right to remain silent will not later be used against him. Wainwright v. Greenfield, 474 U.S. 284, 290–91 (1986). Because a defendant's post-Miranda warning silence could be nothing more than an invocation of his right to silence, it would be fundamentally unfair to permit a breach of that assurance by allowing

impeaching questions as to why he failed to give an exculpatory account to the police after receiving the warnings. *Id.*[3]

Petitioner bases his first claim on the following facts. At trial, Petitioner took the stand in his own defense and testified that he was threatened and physically accosted by Michelle's uncle, Terry Miller, in the Stop 'N Go parking lot during the custody exchange and that, after pulling into the neighboring lot of a beer distributor, Dunkle came over and pulled Petitioner out of his car and began physically beating Petitioner and Petitioner's father, necessitating his fatal shooting of Dunkle. On rebuttal, the Commonwealth called Allegheny County Homicide Detective Regis Kelly, who spoke with Petitioner approximately three hours after the murders had been committed. Prior to speaking with Petitioner, Detective Kelly read him his *Miranda* rights. Petitioner said that he understood his rights and agreed to speak with the detective. Detective Kelly, who was aware that Petitioner had had a gun in his vehicle, asked Petitioner about the firearm and testified as follows.

> I asked him about a firearm. He stated that he owned that gun. And he also stated that he owned another gun and that they were both registered to him. I then asked him if – or I asked him why he had taken the gun and he stated that he really didn't want to get into that. And then he, once again, went on there were always problems, saying that his wife had always caused problems. I asked him again for the reasons he had the gun in the car.

At this point, the Prosecutor interrupted the Detective's testimony and defense counsel objected contending that Detective Kelly's testimony was an improper comment on Petitioner's invocation of this right to remain silent. The Prosecutor agreed and noted that he told Detective

_____

3. Not every reference to a defendant's silence results in a <u>Doyle</u> violation. Where no governmental action induces the defendant to remain silent, the <u>Miranda</u>-based fairness rationale does not control. <u>Fletcher v. Weir</u>, 455 U.S. 603, 606 (1982). Consequently, the Government permissibly may impeach a defendant's testimony using his pre-arrest silence, <u>Jenkins v. Anderson</u>, 447 U.S. 231, 240 (1980); his post-arrest, pre-<u>Miranda</u> warning silence, <u>Fletcher</u>, 455 U.S. at 605–07; and any voluntary post-<u>Miranda</u> warning statements, <u>Anderson v. Charles</u>, 447 U.S. 404, 408–09 (1980). Additionally, there may be no <u>Doyle</u> violation where the trial court sustains an objection to the improper question and provides a curative instruction to the jury, thereby barring the prosecutor from using the silence for impeachment. <u>Greer v. Miller</u>, 483 U.S. 756, 764-65 (1987).

Kelly that he could not testify as to Keitel's invocation of his right to remain silent until speaking with his attorney. Unfortunately, the Commonwealth continued with its questioning as follows.

> Q:      Detective Kelly, did Mr. Keitel say anything to you about being pulled out of his vehicle and beaten outside of his vehicle by Charles Dunkle?
>
> A:      No, he did not.
>
> Q:      Did he ever say anything to you about being physically touched by anybody in the Stop 'N Go parking lot?
>
> A:      No, he did not.
>
> Q:      Did he ever say anything to you about Charles Dunkle or anybody else running him off the road as he left the Stop 'N Go parking lot?

At this point, defense counsel objected and requested a sidebar contending that the prosecutor should not be allowed to elicit things that Keitel did not say during his interview with Detective Kelly. After hearing argument, the trial court ruled that the Prosecutor could not ask Detective Kelly what Petitioner had not said during the interview. Defense Counsel then moved for a mistrial, which the Trial Court denied. The Commonwealth then decided not to ask Detective Kelly any further questions on direct examination.

Petitioner raised this claim on direct appeal where the Pennsylvania Courts determined that, while the references to Keitel's silence were improper, they were harmless and did not justify reversing the conviction. Specifically, the Superior Court held as follows.

> In contrast, in the case *sub judice*, Appellant did not proffer any testimony with respect to what he did or did not tell Detective Kelly. The Commonwealth merely asserts that it was entitled to impeach Appellant with the fact that he had never revealed certain parts of his story to the authorities before trial. As noted previously, this sort of impeachment is exactly the form of impeachment which has been repeatedly and uniformly declared improper by the courts of Pennsylvania. As such, it is clear that, under the facts of this case, the references to Keitel's silence were improper.
>
> However, this does not end our analysis, as an improper reference to a defendant's silence is subject to a harmless error analysis. Even an explicit

reference to silence is not reversible error where it occurs in a context not likely to suggest to the jury that silence is equivalent of a tacit admission of guilt. An error will be considered harmless where the appellate court can conclude beyond a reasonable doubt that the error did not contribute to the verdict. Consequently, if there is a reasonable probability that the verdict was influenced by the error, it cannot be considered harmless. We may conclude that an error was harmless when the uncontroverted evidence of guilt is overwhelming, so that the significance of the error pales in comparison. It is the Commonwealth's burden to establish that the error was harmless.

In the case *sub judice*, it is uncontradicted that Appellant and Michelle Keitel were engaged in a protracted, bitter divorce. Disputes over custody exchanges had been common, with many allegations of improper conduct on the part of each of party. Knowing the tensions would be high at this exchange, as Michelle had violated the custody order, Appellant nevertheless brought a handgun and a stun gun, as well as a broken off pool cue, with him to the exchange.

Forensic evidence indicated that Appellant shot all three victims at close range, and indicated that Michelle Keitel's wounds were suggestive of Michelle being in a defensive posture when shot. Taking all of this uncontradicted evidence together, we conclude beyond a reasonable doubt that the Commonwealth proffered overwhelming evidence of Keitel's guilt. By comparison, the reference to Appellant's assertion of his right to silence was *de minimis*, and therefore harmless. The brief exchange between the ADA and Detective Kelly, consisting of three questions and only two answers, did not create the appearance of a tacit admission by Keitel. As a result, we understand the ruling of the trial court, and affirm its decision to deny the motion for a mistrial in this respect.

Commonwealth Exhibit 25 at 11-13 (ECF No. 7-7, pp. 9-13) (internal citations omitted).

It is clear that the state appellate court reviewed Petitioner's claim under the "harmless beyond a reasonable doubt" standard set forth in Chapman v. California, 386 U.S. 18 (1967), which applies on direct appeal. On collateral review, however, this Court applies the harmless error standard set forth in Kotteakos v. United States, 328 U.S. 750 (1946), analyzing whether the error "had substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 629–30 (1993) (rejecting the more stringent "harmless-beyond-a-reasonable-doubt standard" set forth in Chapman v. California, 386 U.S. 18 (1967)); *accord* Fry v. Pliler, 551 U.S. 112, 119–22 (2007) (discussing Brecht post-AEDPA). *See also* Hassine v.

Zimmerman, 160 F.3d 941, 953 (3d Cir. 1998).

As recognized by the Supreme Court in Brecht:

> State courts are fully qualified to identify constitutional error and evaluate its prejudicial effect on the trial process under Chapman, and state courts often occupy a superior vantage point from which to evaluate the effect of trial error. For these reasons, it scarcely seems logical to require federal habeas courts to engage in the identical approach to harmless-error review that Chapman requires state courts to engage in on direct review.

Brecht, 507 U.S. 619, at 636 (citation omitted). Thus, the Court held that the Kotteakos harmless-error standard applies in determining whether habeas relief must be granted because of constitutional error of the trial type.

Under Brecht and its progeny, a constitutional trial error is not harmless if the court is in "grave doubt" as to whether the error had a substantial and injurious effect or influence in determining the jury's verdict. O'Neal v. McAninch, 513 U.S. 432, 436 (1995). "Grave doubt" exists when, "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." Id. at 435.

In evaluating Petitioner's claim, I must determine whether, and to what extent, the jury's decision to accept the State's version of the facts rather than Petitioner's was influenced by the Prosecutor's Doyle violation. If the jury disbelieved Petitioner and convicted him because of the Doyle violation, the error was not harmless. The crucial inquiry is the "impact of the error on the minds of the jurors in the total setting." Yohn v. Love, 76 F.3d 508, 523 (3d Cir. 1996) (citing Kotteakos, 328 U.S. at 764). While the nature of the evidence is important, I must also examine the phases of the trial affected by the error and determine whether the error had a substantial influence on the verdict despite sufficient evidence to support the result apart from the error. Id. (citing Kotteakos, 328 U.S. at 765). In so doing, I must weigh the impact of evidence on the jury and make a judgment as to how the jury would reasonably perceive Petitioner's version of events

with and without the <u>Doyle</u> violation.  *See* <u>Hassine v. Zimmerman</u>, 160 F.3d 941, 955 (3d Cir. 1998).

At issue in <u>Brecht</u> was a <u>Doyle</u> violation not unlike the case at bar.  In that case, the Court held as follows:

> .  .  . All that remains to be decided is whether petitioner is entitled to relief under this standard based on the State's <u>Doyle</u> error.  Because the Court of Appeals applied the <u>Kotteakos</u> standard below, we proceed to this question ourselves rather than remand the case for a new harmless-error determination.  At trial, petitioner admitted shooting Hartman, but claimed it was an accident.  The principal question before the jury, therefore, was whether the State met its burden in proving beyond a reasonable doubt that the shooting was intentional.  Our inquiry here is whether, in light of the record as a whole, the State's improper use for impeachment purposes of petitioner's post-<u>Miranda</u> silence "had substantial and injurious effect or influence in determining the jury's verdict."  We think it clear that it did not.
>
> The State's references to petitioner's post-<u>Miranda</u> silence were infrequent, comprising less than two pages of the 900-page trial transcript in this case.  And in view of the State's extensive and permissible references to petitioner's pre-Miranda silence- *i.e.*, his failure to mention anything about the shooting being an accident to the officer who found him in the ditch, the man who gave him a ride to Winona, or the officers who eventually arrested him-its references to petitioner's post-<u>Miranda</u> silence were, in effect, cumulative.  Moreover, the State's evidence of guilt was, if not overwhelming, certainly weighty.  The path of the bullet through Mr. Hartman's body was inconsistent with petitioner's testimony that the rifle had discharged as he was falling.  The police officers who searched the Hartmans' home found nothing in the downstairs hallway that could have caused petitioner to trip.  The rifle was found outside the house (where Hartman was shot), not inside where petitioner claimed it had accidently fired, and there was a live round rammed in the gun's chamber, suggesting that petitioner had tried to fire a second shot.  Finally, other circumstantial evidence, including the motive proffered by the State, also pointed to petitioner's guilt.
>
> In light of the foregoing, we conclude that the <u>Doyle</u> error that occurred at petitioner's trial did not substantially influence the jury's verdict.  Petitioner is therefore not entitled to habeas relief, and the judgment of the Court of Appeals is affirmed.

<u>Brecht</u>, 507 U.S. at 638-39.

In the case at bar, Petitioner contends that the <u>Doyle</u> violation could not have been

harmless because it went to the heart of his defense.  He maintains that, because he was the only witness testifying as to his version of the events, and because the <u>Doyle</u> error undermined his credibility, it necessarily had a "substantial and injurious effect or influence in determining the jury's verdict."  This Court disagrees and finds that the <u>Doyle</u> error that occurred at Petitioner's trial did not substantially influence the jury's verdict.

The undisputed facts reveal that Petitioner brought a loaded handgun with him to the custody exchange on that fateful day.  That loaded revolver was in plain sight and easily accessible sitting on the front seat next to him after he loaded his children in the car.  In addition to bringing the revolver that he used to shoot Michelle, her boyfriend and her father, Petitioner also brought with him a stun gun, the bottom half of a pool cue and a pair of black leather gloves routinely used by uniformed police officers as weapons.  Petitioner did not dispute that these shootings were done by him with the loaded gun that he voluntarily brought with him to the custody exchange.

Dr. Shaun Ladham, a forensic pathologist for the Allegheny County Coroner's Office who performed the autopsy on Michelle's body, testified that the gunshot wound to Michelle's forehead was a direct contact wound.  Dr. Robert Levine, a well-known firearms expert from the coroner's office, testified that the bullet hole in the sleeve of Michelle's coat indicated that she had futilely attempted to stop the bullet with her arm.  Charles Walker, Michelle's father, who was shot in the stomach by Petitioner, testified that he observed Petitioner extend his arm and shoot Michelle in the head, killing her instantly.  Two unrelated eye-witnesses testified that, shortly before the shooting, Petitioner purposefully ran into Michelle with his car causing her to fly into the air and fall on her hands and knees.  These same eye-witnesses, both of whom were

at the Stop and Go parking lot, testified that neither one saw Michelle threaten Petitioner or his father.

Under Pennsylvania law, to uphold a conviction for first degree murder, the Commonwealth must prove that the defendant acted with a specific intent to kill; that a human being was unlawfully killed; that the person accused did the killing; and that the killing was done with malice aforethought, in addition to the establishment of premeditation and deliberation. 18 Pa. Cons. Stat. § 2502(a); Commonwealth v. Marinelli, 690 A.2d 203, 211, 547 Pa. 294, 309 (1997). Use of a deadly weapon on a vital part of the body is sufficient to establish the specific intent to kill necessary to convict for first-degree murder. *Id.*

The undisputed evidence shows that Petitioner put a gun directly to Michelle's head and pulled the trigger. There was no testimony that Michelle was beating Petitioner's father or in any way physically aggressive towards Petitioner or his father. Even if Petitioner's version of events is given credit, which the jury did not, there is no justification for using deadly force to subdue Michelle who posed no threat to Petitioner or his father. Because the evidence clearly showed that Petitioner was never faced with anything approaching deadly force from Michelle, he was certainly not justified in his shooting of her. As a result, no reasonable jury could accept that the shooting was in self-defense. Petitioner shot Michelle after he shot Dunkle, who was lying on the pavement dying in her arms. Clearly she was no threat to him at all and no jury could accept that she was. She had no weapon and physically could not have been a threat. Given that the prosecution's evidence overwhelmingly established Petitioner's guilt, any error in allowing in an alleged reference to petitioner's right to remain silent is harmless. The reference to his assertion of his right to silence was *de minimis*: the brief exchange between the Prosecutor and Detective Kelly, consisting of three questions and only two answers, did not create the

appearance of a tacit admission by Petitioner. This Court simply is not in grave doubt that the improper admission of the reference to Petitioner's post-<u>Miranda</u> silence had a "substantial and injurious effect or influence" on the jury's verdicts. Accordingly, Petitioner is not entitled to relief as to this claim.

To support a third degree murder conviction, the Commonwealth must prove the defendant committed the killing with malice aforethought. The Supreme Court of Pennsylvania has explained as follows.

> Malice is one of the essential elements of third degree murder, and it is the distinguishing factor between murder and manslaughter:
>
> > Malice express or implied is the criterion and absolutely essential ingredient of murder. Malice in its legal sense exists not only where there is a particular ill will, but also whenever there is a wickedness of disposition, hardness of heart, wanton conduct, cruelty, recklessness of consequences and a mind regardless of social duty. Legal malice may be inferred and found from the attending circumstances.
> >
> > To summarize: If there was an unlawful killing with (legal) malice, express, or implied, that will constitute murder even though there was no intent to injure or kill the particular person who was killed and even though his death was unintentional or accidental.
>
> Thus, malice may be found to exist not only in an intentional killing, but also in an unintentional homicide where the perpetrator consciously disregarded an unjustified and extremely high risk that his actions might cause death or serious bodily harm.
>
> . . .
>
> Appellant intentionally pointed a loaded gun at the victim and shot him in the chest. Under these circumstances, whether the gun discharged accidentally or was fired intentionally is irrelevant for the purpose of determining the existence of malice.[FN3] Even if, as appellant claims, he did not know that the gun was loaded and intended only to "scare" the victim, his conduct nevertheless unjustifiably created an extremely high degree of risk, thereby evincing a wanton and reckless disregard for human life. By intentionally aiming a gun at Williams without knowing for a certainty that it was not loaded, appellant exhibited that

type of cruel and wanton conduct of which legal malice is made.

> FN3. In rejecting appellant's defense that the shooting was accidental, we note that the only direct evidence tending to show accident was appellant's own testimony, which the trier of fact was free to disbelieve. Furthermore, even accepting as true appellant's self-serving statements, when he pointed the gun at Williams, he engaged in the type of grossly reckless conduct which he should have known was likely to result in serious bodily harm or death to another. Such a wanton disregard of the consequences of his actions proved that at the time of the shooting appellant possessed that state of mind termed malice.

Commonwealth v. Young, 494 Pa. 224, 227-229, 431 A.2d 230, 231 - 232 (1981) (inernal quotations and citations omitted).

Similarly, in the case at bar, Petitioner intentionally pointed a loaded gun at Michelle's boyfriend, Charles Dunkle, and shot him in the chest. The pathologist testified that the wound was consistent with the gun having been placed against the chest when it was fired. Under these circumstances, whether the gun discharged accidentally or was fired intentionally is irrelevant for the purpose of determining the existence of malice. By intentionally aiming a gun at Dunkle Petitioner exhibited that type of cruel and wanton conduct that supports the jury's verdict of third degree murder. Again, any error in allowing in the alleged reference to Petitioner's right to remain silent was harmless. Petitioner is not entitled to any habeas relief as to his first claim.

2.    Trial Court's Failure to Grant Mistrial

Petitioner next asserts that he did not receive a fair trial where the Prosecutor told the jury through cross-examination that Petitioner had participated in a criminal solicitation to murder his former wife. In this regard, the following occurred during the cross-examination of Petitioner by the Prosecutor:

> Q.    Do you remember telling [Michelle Keitel] that you paid TerryVenter (phonetic) – tried to pay Terry Venter $10,000 to have Joy [Mr.Keitel's former wife] killed?

| | |
|---|---|
| Mr. Difenderfer: | Objection, Your Honor. |
| The Witness: | No, sir. |
| The Court: | Objection is overruled. |
| Mr. Difenderfer: | Your Honor, may we approach. |
| The Court: | No. |
| Mr. Difenderfer: | Move for a mistrial, Your Honor. |
| The Court: | Denied. |

(TT 994-995).

Petitioner's second claim is "exhausted" for purposes of this Court's review as it was presented to all three levels of the state courts in his direct appeal.  Notwithstanding, as noted by Respondent, this claim is based upon an alleged misapplication of Pennsylvania law.  In his state court briefs, Petitioner raised this issue solely in terms of trial court error; he cited to no federal or constitutional authority in support of his claim.   As a result, the Pennsylvania courts reviewed his claim under Pennsylvania law without any analysis of constitutional principles.  Specifically, the Superior Court determined this issue as follows.

Appellant raises the argument that the Commonwealth's question violated 42 Pa. Cons. Stat. § 5918,[4] and further contends that Commonwealth v. Garcia,

---

4  Section 5918 states:

§ 5918. Examination of defendant as to other offenses

No person charged with any crime and called as a witness in his own behalf, shall be asked, or if asked, shall be required to answer, any question tending to show that he has committed, or been charged with, or been convicted of any offense other than the one wherewith he shall then be charged, or tending to show that he has been of bad character or reputation unless:

(1) he shall have at such trial, personally or by counsel, asked questions of the witness for the prosecution with a view to establish his own good reputation or character, or has given evidence tending to prove his own good character or reputation; or

(2) he shall have testified at such trial against a codefendant, charged with the

551 Pa. 616, 712 A.2d 746 (1998), necessitates a finding of reversible error. Appellant misses the point, however, of the Commonwealth's usage of this evidence, as well as the reason the trial judge permitted its admission.

Keitel's trial tactic was to paint himself as a law-abiding and peaceful individual who was only trying to enjoy the periods of partial custody given to him in the custody order, but was faced with the contemptuous and oftentimes threatening conduct of his estranged wife and her family. Keitel admitted the shootings but claimed he had done so in self-defense. Although the trial record is replete with references to these contentions, Keitel's trial strategy was laid out in the opening statement of his trial counsel when comments were made that Terry Miller "chase[d] him around a tree and beat him up"·and that Charles Dunkle and Charles Walker were "constantly intimidating, constantly threatening."

As aforesaid, Keitel claimed that he had acted in self-defense, as well as in defense of his father, when he shot Michelle Keitel, Dunkle and Walker. As the trial judge capably instructed the jury, the basic rule for self-defense is that the defendant "reasonably believes that he or the other person who he seeks to protect is in immediate danger of unlawful force." Therefore, Keitel's state of mind at the time of the shooting was a critical factor for the jury to decide. Additionally, Keitel's state of mind was in issue due to the jury's consideration of third degree murder and voluntary manslaughter.

The Commonwealth consistently maintained that the evidence of what Appellant had allegedly told Michelle Keitel was to demonstrate malice and menacing intent toward Michelle and her family, despite his assertions of his own good character. As noted by the trial judge, the Commonwealth did not make any attempt to actually prove that Keitel had hired anyone to hurt, let alone kill, his former wife.

We have previously recognized that Pennsylvania courts "go cautiously when considering whether to admit evidence of prior convictions for purposes of impeaching the credibility of a defendant testifying in his own behalf." In Garcia, our Supreme Court considered the admission of evidence of prior *crimen falsi* convictions for purposes of impeachment. The Supreme Court specifically found that none of the limited exceptions specified in section 5918 applied. In this case, however, we are not presented with *crimen falsi* convictions; thus Garcia is easily distinguishable, and consequently we must review whether the trial court correctly found that the § 5918 exception applied.

. . .

In this case, the trial found that the question arising from the excerpt from the decedent's diary to be an attempt to establish Keitel's malice and intent to hurt the victims, and to negate his portrayal of himself as a victim. As aforesaid, the

---

same offense.

evidence was not of a prior conviction, but could have been interpreted as asking Keitel whether he had previously committed a criminal act. Questions concerning the admissibility of evidence lie within the sound discretion of the trial court, and a reviewing court will not reverse the court's discretion on such a question absent a clear abuse of discretion. As we have often said, a discretionary ruling cannot be overturned simply because a reviewing court disagrees with the trial court's conclusions.

By voluntarily raising the issue of his good and peaceful character, Keitel placed himself squarely within the exception provided in §5918(1) and opened himself up for the attack on his credibility by the Commonwealth. Therefore, we find no error in the trial court's denial of the motion for a mistrial.

ECF No. 7-7, pp. 14-18 (footnote in original) (internal quotations and citations omitted).

It is well known that a state prisoner like Petitioner may not be granted federal habeas corpus relief unless he demonstrates that he is in custody in violation of the United States Constitution or federal law. *See* 28 U.S.C. § 2254(a). *See also* Smith v. Phillips, 455 U.S. 209 (1982); Geschwendt v. Ryan, 967 F.2d 877 (3d Cir.), *cert. denied*, 506 U.S. 977 (1992); Zettlemoyer v. Fulcomer, 923 F.2d 284 (3d Cir.), *cert. denied*, 502 U.S. 902 (1991). Mere violations of state law or procedural rules cannot provide the basis for federal habeas relief absent a deprivation of constitutional magnitude. Engle v. Isaac, 456 U.S. 107 (1982); Wells v. Petsock, 941 F.2d 253 (3d Cir. 1991), *cert. denied*, 505 U.S. 1223 (1992). Thus, to the extent Petitioner's second claim is premised upon a violation of Pennsylvania law, it does not assert a viable basis for federal habeas corpus relief.

Moreover, Petitioner has failed to satisfy the exhaustion requirement in 28 U.S.C. § 2254 for any constitutional claim he seeks to raise. To this end, a petitioner must have "fairly presented" his habeas claims to all levels of the state courts. Lines v. Larkins, 208 F.3d 153, 159 (3d Cir. 2000), citing 28 U.S.C. § 2254(b); O'Sullivan, 526 U.S. at 848. To "fairly present" a claim for exhaustion purposes, "a petitioner must have presented a federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is

being asserted," McCandless v. Vaughn, 172 F.3d 255, 261 (3d Cir. 1999) (emphasis added), so that they had "a 'fair opportunity' to apply controlling legal principles to the facts bearing upon his constitutional claim," Anderson v. Harless, 459 U.S. 4, 6 (1982) (quoting Picard v. Connor, 404 U.S. 270, 276-77 (1971)).  *See also* Baldwin v. Reese, 541 U.S. 27, 29-34 (2004); Nara v. Frank, 488 F.3d 187, 197-99 (3d Cir. 2007); Tome v. Stickman, 167 Fed. App'x 320, 322-323 (3d Cir. 2006) ("Fair presentation requires that the claim brought in federal court be the substantial equivalent of that presented to the state courts.  Both the legal theory and the facts underpinning the federal claim must have been presented to the state courts, and the same method of legal analysis must be available to the state court as will be employed in the federal court.") (internal citation omitted).

It is not sufficient that all the facts necessary to support the federal claim were before the state courts.  Keller v. Larkins, 251 F.3d 408, 413 (3d Cir. 2001).  Moreover, a mere "passing reference to a 'fair trial'" is insufficient to put the state court on notice that petitioner is asserting a federal constitutional claim.  *Id*. at 415.  "If state courts are to be given the opportunity to correct alleged violations of its prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution." Duncan v. Henry, 513 U.S. 364, 365-66 (1995) (per curiam).  Thus, as the Supreme Court explained, "[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court." *Id*. at 366.  *See also* Baldwin, 541 U.S. at 32 ("ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion, that does so.").  *See also* Daye v. Attorney

General of New York, 696 F.2d 186, 194 (2d Cir. 1982) (*en banc*).[5]  *Cf.* Minett v. Hendricks 135 Fed. App'x 547 (3d Cir. 2005) (holding that, because petitioner explicitly invoked the Due Process Clause of the Fourteenth Amendment, and relied on one Supreme Court case by analogy he exhausted his claim, although just barely).

In the case at bar, Petitioner did not assert a violation of a federal or constitutional right; nor did he assert his claim in terms that bring to mind a constitutional right.  Moreover, in his pleadings in the state courts, he cited only Pennsylvania authorities.  Because Petitioner did not present a constitutional challenge to the state courts, he has failed to comply with the exhaustion requirement in 28 U.S.C. § 2254, a necessary prerequisite to habeas corpus review.  Moreover, Petitioner cannot now raise any constitutional challenge associated with his discovery claim due to the eligibility requirements for obtaining post-conviction relief in Pennsylvania.  *See* 42 Pa. Cons. Stat. § 9543(a)(2).  Consequently, the procedural default doctrine prohibits this Court from reviewing any constitutional challenge at issue in Petitioner's second claim.

Finally, even if the Court were to assume for the sake of argument that Petitioner fairly presented to the Superior Court a claim that the trial court violated his federal due process rights, Petitioner would not be entitled to relief in federal habeas.[6]  In this regard, a claim that one was denied "due process" is a claim that one was denied "fundamental fairness."  *See* Riggins v.

---

5.  In Daye, the court recognized that the more specifically a right is described, "the more easily alerted a court will be to consider a constitutional constraint."  696 F.2d at 193.  By contrast, a claim described in "very broad terms," like the "denial of a fair trial," may not be fairly presented to a state court for purposes of exhausting a federal due process claim.  *Id.*  "Fair trial," after all, is a concept that embraces "many concrete notions," some fundamental and some not; not every event accurately described as "unfair" would violate the defendant's constitutional rights.

6.  To the extent that Petitioner's claims are unexhausted, this Court will deny them on the merits pursuant to 28 U.S.C. § 2254(b)(2): "An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State".  *See* Taylor v. Horn, 504 F.3d 416, 427 (3d Cir. 2007) ("Here, because we will deny all of Taylor's claims on the merits, we need not address exhaustion"); Bronshtein v. Horn, 404 F.3d 700, 728 (3d Cir. 2005) ("We would permit Bronshtein to attempt on remand to establish a reason to excuse his procedural default, but we find it unnecessary to do so because it is apparent that the claims in question lack merit.  Under 28 U.S.C. § 2254(b)(2), we may reject claims on the merits even though they were not properly exhausted, and we take that approach here").

Nevada, 504 U.S. 127, 149 (1992) ("We have said that 'the Due Process Clause guarantees the fundamental elements of fairness in a criminal trial'"); Lisenba v. California, 314 U.S. 219, 236 (1941) ("The aim of the requirement of due process is . . . to prevent fundamental unfairness"). When reviewing claims alleging the denial of due process, the Supreme Court has cautioned that:

> [i]n the field of criminal law, we have defined the category of infractions that violate 'fundamental fairness' very narrowly based on the recognition that, beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation. The Bill of Rights speaks in explicit terms to many aspects of criminal procedure, and the expansion of those constitutional guarantees under the open-ended rubric of the Due Process Clause invites undue interference with both considered legislative judgments and the careful balance that the Constitution strikes between liberty and order. . . . [I]t has never been thought that decisions under the Due Process Clause establish this Court as a rule-making organ for the promulgation of state rules of criminal procedure.

Medina v. California, 505 U.S. 437, 443 (1992) (internal quotations and citations omitted).

> Judges are not free, in defining 'due process,' to impose on law enforcement officials their personal and private notions of fairness and to disregard the limits that bind judges in their judicial function. They are to determine only whether the action complained of violates those fundamental conceptions of justice which lie at the base of our civil and political institutions, and which define the community's sense of fair play and decency.

Dowling v. United States, 493 U.S. 342, 353 (1990) (internal quotation and citations omitted).

Moreover, a federal court must keep in mind the standard of review to be applied to allegations of trial error. In this regard, criminal defendants in this country are entitled to a fair, but not a perfect, trial. "[G]iven the myriad safeguards provided to assure a fair trial, and taking into account the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial," and the Constitution does not demand one. United States v. Hasting, 461 U.S. 499, 508 (1983) (internal citations omitted). This focus on fairness, rather than on perfection, protects society from individuals who have been duly and fairly convicted of crimes,

thereby promoting "public respect for the criminal process." <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 681 (1986).

The Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules. <u>Marshall v. Lonberger</u>, 459 U.S. 422, 438 n. 6 (1983). Notwithstanding, the admission of evidence may violate due process where the evidence undermines the fundamental fairness of the entire trial. *See* <u>Lesko v. Owens</u>, 881 F.2d 44, 51 (3d Cir. 1989) ("the erroneous admission of evidence that is relevant, but excessively inflammatory, might rise to the level of a constitutional violation"); <u>Bisaccia v. Attorney General</u>, 623 F.2d 307, 313 (3d Cir. 1980) (when "the probative value of ... evidence, though relevant, is greatly outweighed by the prejudice to the accused from its admission, then use of such evidence by a state may rise to the posture of fundamental fairness and due process of law").

However, this Court is not aware of any Supreme Court case clearly establishing that the admission of prior convictions or bad acts evidence constitutes a violation of federal constitutional rights or due process. Indeed, Supreme Court precedent suggests the contrary. *See, e.g.*, <u>Estelle v. McGuire</u>, 502 U.S. 62 (1991) (allowing evidence of prior injuries in a trial for infant murder, and refusing habeas relief for a deficient limiting instruction); <u>Spencer v. Texas</u>, 385 U.S. 554 (1967) (rejecting due process challenge to admission of evidence of prior similar crimes when judge gives limiting instruction). Because Petitioner has not shown that the trial court's failure to grant his request for a mistrial was contrary to, or an unreasonable application of clearly established federal law, as determined by the Supreme Court, Petitioner is not entitled to habeas relief on this ground. *Accord* <u>Minett v. Hendricks</u>, 135 Fed. App'x 547 (3d Cir. 2005) (rejecting claim that admission of "other crimes" evidence is contrary to or an unreasonable application of clearly established Supreme Court precedent); <u>Charlton v. Franklin</u>,

503 F.3d 1112, 1115 (10th Cir. 2007) (state court's admission of evidence of petitioner's prior bad acts did not render trial fundamentally unfair or warrant habeas relief).

3.    Ineffective Assistance of Counsel

Petitioner's remaining claims assert ineffective assistance of counsel.  In this regard, the Sixth Amendment right to counsel exists "in order to protect the fundamental right to a fair trial." Lockhart v. Fretwell, 506 U.S. 364, 368 (1993) (quoting Strickland v. Washington, 466 U.S. 668, 684 (1984)).  *See also* Kimmelman v. Morrison, 477 U.S. 365, 374 (1986) (holding that the essence of a claim alleging ineffective assistance is whether counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect).

The Supreme Court has formulated a two-part test for determining whether counsel rendered constitutionally ineffective assistance: 1) counsel's performance was unreasonable; and 2) counsel's unreasonable performance actually prejudiced the defense.  Strickland, 466 U.S. at 687.  The first prong of the Strickland test requires a defendant to establish that his attorney's representation fell below an objective standard of reasonableness by committing errors so serious that he or she was not functioning as "counsel" guaranteed by the Sixth Amendment.  Strickland, 466 U.S. at 688.  The second prong requires a defendant to demonstrate that counsel's errors deprived him of a fair trial and the result was unfair and unreliable.  Strickland, 466 U.S. at 689. A defendant is not entitled to relief unless he makes both showings.  *Id*. at 687.  Moreover, "[a] court need not first determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, that course should be followed." *Id*. at 694.  The Strickland standard applies equally to appellate counsel.

Smith v. Robbins, 528 U.S. 259, 285 (2002). Pennsylvania applies the same test for ineffective assistance of counsel as the Strickland test used in federal courts. Werts v. Vaughn, 228 F.3d 178, 203 (3d Cir. 2000).

With regard to the first criterion, counsel's effectiveness is measured objectively considering all the circumstances. Strickland, 466 U.S. at 687-88. In evaluating counsel's performance, the Court must "indulge a strong presumption" that counsel's challenged actions might be considered sound strategy under the circumstances. *Id*.at 689. "Strickland and its progeny make clear that counsel's strategic choices will not be second guessed by *post hoc* determinations that a different trial strategy would have fared better." Rolan v. Vaughn, 445 F.3d 671, 681-82 (3d Cir. 2006) (citing Strickland, 466 U.S. at 689). The relevant inquiry is not whether counsel was prudent, appropriate, or perfect; rather, the focus is simply to ensure that Petitioner received a fundamentally fair trial.

With respect to the second criterion, to establish prejudice, the defendant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Prejudice must be evaluated in light of the "totality of the evidence presented at trial" and a verdict only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Rolan, 445 F.3d at 982 (quoting United States v. Gray, 878 F.2d 702, 712 (1989)).

In analyzing Petitioner's claims under the two-part test announced in Strickland, this Court must apply the standards set forth in section 2254(e) concerning the presumption of correctness applicable to state court factual findings. The question of effectiveness of counsel

under <u>Strickland</u> is a mixed question of law and fact; it requires the application of a legal standard to the historical, fact determinations. <u>Berryman</u>, 100 F.3d 1089, 1095 (3d Cir. 1996). In this regard, a state court's finding that counsel had a trial strategy is a finding of fact to which the presumption applies. *Id*. Likewise, a state court's determination that a decision was a tactical one is a question of fact. *Id*.

The Supreme Court recently reiterated the difficulty of prevailing on an ineffectiveness claim on habeas review.

> The pivotal question is whether the state court's application of the Strickland standard was unreasonable. This is different from asking whether defense counsel's performance fell below Strickland's standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an unreasonable application of federal law is different from an incorrect application of federal law." A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself.

<u>Harrington v. Richter</u>, __ U.S. __, 131 S.Ct. 770, 785 (2011) (internal quotations and citations omitted). The Court further instructed:

> Surmounting Strickland's high bar is never an easy task. An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with adversary process the right to counsel is meant to serve. Even under de novo review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence. The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.

> Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both highly deferential and when the two apply in tandem, review is doubly so. The Strickland standard is a general one, so the range of reasonable

applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under §2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

Harrington, 131 S.Ct. at 788 (internal quotations and citations omitted).

In his first ineffective assistance claim, Petitioner asserts that trial counsel had no reasonable basis for failing to object to the trial court's s jury instruction, which Petitioner claims created an unconstitutional mandatory presumption in favor of the Commonwealth and directed a verdict of guilty of murder of Charles Dunkle in violation of Petitioner's federal due process rights.

In the closing instructions, after having provided lengthy instructions concerning self-defense (TT 1198-1203), the trial court briefly addressed the matter of motive, then stated:

The Commonwealth also offered evidence tending to establish that the victim, Charles Dunkle, had a reputation for being a non-violent, peaceful individual. This evidence of Mr. Dunkle's reputation for non-violence and peacefulness is relevant to determine whether Charles Dunkle was an aggressor in this instant (sic). The evidence of the victim's reputation as being non-violent and peaceful refutes the defendant's evidence that Dunkle attacked him.

(TT 1203-1204). Petitioner contends that the use of the word "refutes" in this instruction had the effect of creating an improper mandatory presumption negating his defense of justification as to this shooting.

This Court initially notes that jury instructions are matters of state law. The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal. Henderson v. Kibbe, 431 U.S. 145, 154 (1977) (emphasis added). Thus, before a federal court may grant federal habeas corpus relief with respect to a state court conviction, "it must be established not merely that the instruction is

undesirable, erroneous, or even universally condemned, but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment. *Id*. (quoting Cupp v. Naughten, 414 U.S. 141, 146-47 (1973) (citation omitted)). Even erroneous instructions do not warrant federal habeas relief unless a petitioner demonstrates that the instructions so infected the trial that the resulting conviction violated due process. Estelle v. McGuire, 502 U.S. 62, 72 (1991). Furthermore, a petitioner raising the omission of an instruction as error has a heavy burden because an omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law. Henderson v. Kibbe, 431 U.S. at 155. In weighing the prejudice from an allegedly improper charge, the instruction may not be judged in artificial isolation but must be considered in the context of the instructions as a whole and the trial record. Estelle, 502 U.S. 72; Flamer v. Delaware, 68 F.3d 736, 736 (3d Cir. 1995).

> In a criminal trial, the State must prove every element of the offense, and a jury instruction violates due process if it fails to give effect to that requirement. Nonetheless, not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation. The question is whether the ailing instruction so infected the entire trial that the resulting conviction violates due process. A single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge. If the charge as a whole is ambiguous, the question is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution.

Middleton v. McNeil, 541 U.S. 433, 437 (2004) (internal quotations and citations omitted).

During the PCRA proceedings, Judge Manning reviewed this claim as follows.

> The defendant's first claim is that trial counsel was ineffective for failing to object to the trial court's jury instruction as to self defense. This claim is without merit as a matter of law because the jury's instructions, taken as a whole, advised the jury of the proper legal principles that they were to apply in deliberating and rendering their verdict. They were properly instructed on the defendant's claims of self defense. The defendant claims that the jury instructions given constituted a mandatory presumption in favor of the Commonwealth as to the issue of self defense because the Court stated that the evidence of the peaceful and non-violent reputation of the victim Charles Dunkle "refutes" the defendant's

evidence that he was attacked by Dunkle. In reviewing a challenge to jury instructions, the test is whether, considering the instructions as a whole, the applicable law was clearly and accurately conveyed to the jury. The challenged words or passage should not be taken out of context of the whole of the charge. The charge must be looked at in its entirety.

The defendant focuses on a single word in this Court's instructions, "refutes", and contends that the jury was not instructed that it had to find that the Commonwealth's evidence of the victim's peaceable nature disproved the defense theory. The defendant's claim is specious. The jury was properly instructed on the elements of self defense and which of the parties bore the burden of proof. In the context in which it was issued, it was clear that the jury was told that they could consider the Commonwealth's evidence of the victim's peaceable nature in determining whether the defendant's actions were justified. The jury was told that the Commonwealth had the burden of proof of proving each and every element of the crimes charged and, with regard to the defendant's claim of self defense, that the Commonwealth had to disprove that beyond a reasonable doubt. They were told that the evidence of the victim's reputation was evidence "tending to establish" that reputation and that it was relevant to their determination of whether the defendant or the victim was the aggressor. Because the Court's instructions, as a whole, properly conveyed to the jury the applicable legal principles that were to guide their deliberations, counsel could not have been ineffective in failing to object to a single word.

ECF No. 9-3, p. 3 (internal citations omitted).

On appeal from the denial of the PCRA petition, the Superior Court of Pennsylvania

addressed the claim as follows.

Jury instructions are evaluated based on the entirety of their content, not on isolated words or excerpts, to determine if they are fair and complete. The use of the word "refutes" in the jury instruction did not make the charge unfair or incomplete. The jury instructions, when read in the entirety of their 39 pages, included abundant directives to the jury that they were the sole determiners of the facts and the credibility of witnesses, including the defendant. We agree with the sound reasoning of the PCRA court and affirm on this basis. Moreover, the failure to object to a single word in a jury instruction is not prejudicial because it is not reasonably likely the result would have been different if the instruction had been changed. Accordingly, Keitel's first claim fails because he cannot establish arguable merit or prejudice.

ECF No. 10-5, p. 9 (internal quotations and citations omitted).

This Court has not discovered any federal law holding trial counsel ineffective for failing to have objected to similar language in jury instructions. Moreover, Petitioner has not demonstrated that there is a reasonable probability that the outcome of the proceeding would have been different had additional jury instructions been given. Nor has he demonstrated that the Superior Court's determination of this claim was contrary to, or an unreasonable application of, clearly established federal or constitutional law. Consequently, Petitioner has failed to demonstrate that he is entitled to habeas corpus relief with respect to this claim. *Cf.* Calderon v. Coleman, 525 U.S. 141 (1998) (a federal court may grant habeas relief based on an erroneous jury instruction only when such error, in the whole context of the particular case, had a substantial and injurious effect or influence on the jury's verdict); Joyce v. Government of Virgin Islands, Criminal No. 2003-57, 2005 WL 5383593, 6 (D. Virgin Islands Oct. 21, 2005) (holding that the jury instructions, as a whole, were not conclusively presumptive in favor of the Government).

Next, Petitioner claims that trial counsel was ineffective for failing to request that the jury be instructed that a killing may be justified if it occurs accidentally in the course of an individual's actions in defending himself. Specifically, he contends that since there was no indication that Michelle Keitel attacked him or his father so as to allow him directly to claim justification with respect to having shot her, trial counsel should have requested a specific instruction to the effect that the shooting of Michelle was an accident that occurred in the course of his defending himself and was thus justifiable.

In his Memorandum Opinion, Judge Manning addressed the claim as follows:

> The defendant next claims that trial counsel was ineffective for failing to request that the jury be instructed that a killing may be justified if, in the course of defending himself, a defendant accidently kills another individual. A self-defense charge is appropriate in cases involving accidental injury when the circumstances

of the case allow that the accidental injury or death occurred within the course of the actor defending himself. Obviously, this charge only applies where the accidental killing occurs while a defendant is acting in self defense. This claim must be dismissed because the defendant could not have suffered any prejudice from the absence of such instruction, even if it were warranted, because the jury specifically rejected the defendant's claim that he was acting in self defense when he shot Charles Dunkle. In order for a jury to have concluded that the death of Michelle Keitel was an accident that occurred while the defendant was acting in self defense as to Charles Dunkle, it would have to first conclude that the defendant did act in self defense. The jury's verdict of guilty as to the charge of homicide in the killing of Charles Dunkle was a rejection of the self defense claim. Because the jury found that the defendant was not acting in self defense, he could not have been helped by the instruction he claims counsel should have requested. Accordingly counsel was not ineffective due the absence of any possible prejudice to the defendant.

ECF No. 9-3, p. 4 (internal citations omitted).

On appeal from the denial of the PCRA petition, the Superior Court of Pennsylvania addressed the claim as follows.

The trial court did not give a homicide by accident instruction, but instead gave a self-defense instruction.[7] Under these circumstances, when Keitel discharged his revolver three times in extremely close proximity to other people, the only lawful act he could have been engaged in was self-defense as to her death. The jury rejected self-defense as to her death. The jury rejected self-defense as to all three victims by finding him guilty of first-degree murder as to Michelle, third-degree as to Dunkle, and aggravated assault as to Walker. Keitel suffered no prejudice from the lack of a homicide by accident charge, because the jury rejected self-defense as to all the victims, so there would be no lawful act to form the basis of a homicide by accident defense. Keitel cannot establish prejudice and his second claim of ineffective assistance of counsel fails.

ECF No. 10-5, pp. 10-11 (footnote in original) (internal citations omitted).

---

7. The trial court instructed the jury as follows:

If a defendant employs deadly force to protect himself, as the defendant alleges here, he must have reasonably believed, reasonably believed, that he or his father or both of them were in immediate danger of death or serious bodily injury from Charles Dunkle, Michelle Walker [Keitel] and/or Charles Walker and reasonably believed it necessary to protect himself or his father.

N.T., 10/29/1998- 10/31/1998, at 1199.

The state court's determination that trial counsel was not ineffective is not contrary to, or an objectively unreasonable application of, federal law as determined by the Supreme Court of the United States. Thus, Petitioner is not entitled to habeas relief as to this claim.

Petitioner's final claim is that trial counsel was ineffective for failing to object because the trial court did not instruct the jury regarding mistaken belief of imminent danger.[8]

In his Memorandum Opinion, Judge Manning addressed the claim as follows.

> The defendant's next two claims assert that trial counsel was ineffective for failing to object to the Court's instructions regarding the elements of a reasonable belief self defense and for failing to specifically request the standard jury instruction 9.505(2) with regard to the killing of Michelle Keitel. This claim will be dismissed because the instructions, as a whole, provided the jury with the proper guidance to evaluating the evidence presented and reaching verdicts. To the extent that the facts may have been justified the Court providing the additional language found in the standard instruction, the defendant could not possibly have suffered prejudice. The jury rejected the claim of self defense as to Charles Dunkle, with whom the defendant, according to the evidence, was involved in altercation. There was no evidence presented that suggested that Michelle Keitel was physically involved in any altercation with the defendant. The jury, which rejected self defense as it pertained to the killing of Charles Dunkle, would certainly not have found self defense, based on the evidence presented, in the killing of Michelle Keitel even had the omitted language been included in the instruction.

ECF No. 9-3, pp. 4-5.

On appeal from the denial of the PCRA petition, the Superior Court of Pennsylvania held as follows.

> In his third and fourth issues, Keitel claims ineffective assistance of counsel for the failure to include in the jury instructions that the self defense justification is available when the defendant mistakenly believes that he is in danger. The italicized portion below was omitted from the jury instructions.
>
> The basic rule for self defense is that a defendant is justified in using force against another person if he reasonably believes he is in immediate danger of unlawful force from that person and

---

[8] . This is otherwise known as an "imperfect" self-defense claim. It is "imperfect" in that it is an unreasonable rather than a reasonable belief that deadly force was required to save the actor's life. An unreasonable belief that one's life is in jeopardy will not excuse a killing, but it will reduce the degree to voluntary manslaughter.

reasonably believes it is necessary, then and there, to use the force which he does use to protect himself. *(Note that a defendant's right of self defense depends upon what he reasonably believes. Thus the right of self defense may be available not only to a person who is in actual danger of unlawful attack but also to one who mistakenly believes that he is. A defendant is entitled to estimate the necessity for the force he employs under the circumstances as he reasonably believes them to be at the time. In the heat of conflict, a person who has been attacked ordinarily has neither time nor composure to evaluate carefully the danger and make nice judgments about exactly how much force is needed to protect himself. Be realistic; consider the limitations of human nature when judging what the defendant believed and whether his beliefs were reasonable.)*

Pa.S.S.C.J.I. 9.505(2). The jury received a self defense instruction that properly permitted the jury to consider a mistaken belief to be reasonable. We agree with the sound reasoning of the PCRA court on these two claims and affirm on this basis.

ECF No. 10-5, pp. 11-12.

The Superior Court's ruling is in conformance with well established law in Pennsylvania. *See, e.g.*, Commonwealth v. McNeil, 439 A.2d 664, 670, 497 Pa. 187, 199 (1981) (holding that counsel was not ineffective in failing to object to inadequate charge where trial court properly advised jury on all elements of self-defense and voluntary manslaughter). Nor is the state court's decision contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States. *See, e.g.*, Sloan v. Gramley, 215 F.3d 1330 (Table), 2000 WL 536164 (7th Cir. May 1, 2000) (holding that the petitioner was not entitled to habeas corpus relief because he failed to show that a reasonable jury would have accepted his self-defense testimony); Weighall v. Middle, 215 F.3d 1058 (9th Cir. 2000) (holding that the state court's application of federal law in rejecting defendant's ineffective assistance of counsel claim for failure to request self-defense instructions was not clearly erroneous and thus not unreasonable and did not support federal habeas relief); United States ex

rel. Jones v. Barnett, 1996 WL 400016 (N.D. Ill. July 15, 1996) (holding that even if it were unreasonable for counsel to have failed to request the instruction, the trial court proceedings were not prejudiced so as to deprive the defendant of a fair trial). Consequently, Petitioner has failed to demonstrate that he is entitled to habeas corpus relief on the basis of the failure of his trial counsel to request additional jury instructions. Thus, he is not entitled to relief on this claim either.

### D. Certificate of Appealability

Section 2253 generally governs appeals from district court orders regarding habeas petitions. Section 2253(c)(1)(A) provides that an appeal may not be taken from a final order in a habeas proceeding in which the detention arises out of process issued by a State court unless a certificate of appealability has been issued. A certificate of appealability should be issued only when a petitioner has made a substantial showing of a denial of a constitutional right. 28 U.S.C. 2254(c)(2). Here, the record fails to show a violation of Petitioner's constitutional rights. Accordingly, a certificate of appealability should be denied.

## III.   CONCLUSION

Based on the discussion above, it is respectfully recommended that the Petition for Writ of Habeas Corpus be denied. It is further recommended that there is no basis upon which to grant a certificate of appealability.

In accordance with the applicable provisions of the Magistrate Judges Act and the Local Rules of Court, the parties shall have fourteen days from the date of the service of this Report and Recommendation to file written objections thereto. Any party opposing such objections shall have fourteen days from the date on which the objections are served to file its response. A party's failure to file timely objections will constitute a waiver of that party's appellate rights.

August 27, 2012                                     /s Cynthia Reed Eddy
                                                    Cynthia Reed Eddy
                                                    United States Magistrate Judge